GARY D. SHAPIRO (4554218)
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022
212.583.9600

Attorneys for Defendants
    MARSHALLS OF MA, INC., MARMAXX OPERATING
    CORPORATION, d/b/a MARMAXX GROUP, THE TJX
    COMPANIES INC.


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTIN GUILLEN, Individually and on behalf of all others similarly situated,<br><br>                   Plaintiff,<br><br>                -against-<br><br>MARSHALLS OF MA, INC., a Delaware corporation; MARMAXX OPERATING CORPORATION, d/b/a MARMAXX GROUP,  a Delaware Corporation; THE TJX COMPANIES INC. a Delaware corporation, and DOES 1 through 100, inclusive,<br><br>                  Defendants. | Case No.  09-CIV-9575 (GWG)<br><br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION AND FACILITATION OF NOTICE PURSUANT TO 29 U.S.C. § 216(b)** |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF RELEVANT FACTS ................................................................. 3

I.      THE PARTIES TO THIS LITIGATION, AND THEIR CONTRASTING VIEWS OF THE ASM ROLE WITHIN MARSHALLS STORES ............................................. 3

        A.     Defendants' Management Structure And Retail Operations ................................ 3

        B.     ASM Job Descriptions And Training ..................................................... 3

        C.     ASMs' Management Duties And Responsibilities............................................. 4

        D.     The Named Plaintiff And His Evidence ............................................. 9

                1.     Plaintiff Martin Guillen.......................................................... 9

                2.     Ellen Ogaian's And Nicole Archibald's Testimony, And The Affidavits Filed By Zobeyda Morales And Lady Diana Santillan .......... 11

II.    OTHER ASMS AND NON-EXEMPT ASSOCIATES TESTIFY REGARDING THE ASM'S MANAGERIAL ROLE AND RESPONSIBILITIES ............................. 14

LEGAL ARGUMENT .......................................................................................... 16

I.      PLAINTIFF CANNOT ESTABLISH THAT HE IS "SIMILARLY SITUATED" TO A NATIONWIDE CLASS ............................................................................... 16

        A.     Authorization Of Notice Under The FLSA Is Discretionary And Should Only Be Granted In "Appropriate" Cases.......................................................... 16

        B.     The Legal Context Within Which Plaintiff's Overtime Claim Must Be Adjudicated ............................................................................... 17

        C.     Plaintiff Has Failed To Submit Sufficient Evidence Of A Nationwide "Violation Of Law" That Could Be Managed Or Tried On A Collective Basis............................................................................... 19

                1.     Plaintiff Attempts To Establish "Victimhood" Based Upon Treatment By His Manager – Not Marshalls Corporate Policies And Procedures.......................................................................... 19

# TABLE OF CONTENTS
## (continued)

Page

2.    Dissimilar Employment Settings Within Marshalls Stores Also Compel Individualized Inquiry ........................................................... 22

D.    In The Absence Of A Common "Illegal" Plan Or Policy, Plaintiff's Proposed Collective Action Is Utterly Unmanageable ...................................... 25

E.    Judicial Authority Does Not Support Plaintiff's Request For Nationwide Notice ........................................................................................ 27

1.    Plaintiff's Cited Authority Do Not Support His Broad Request ............ 27

2.    Plaintiff's Anticipated Reliance Upon *Indergit v. Rite Aid Corp.* Is Misplaced ............................................................................. 30

II.    THE SCOPE AND MANNER OF NOTICE, IF THE COURT DEEMS THIS CASE TO BE "APPROPRIATE" FOR SUCH RELIEF ................................. 32

A.    Notice Should Be Limited To The Port Chester, Hartsdale And Bronx Stores ................................................................................... 32

B.    Plaintiff's Proposed Methodology For Facilitating Notice And Request For Confidential Information About Potential Class Members Are Improper ............................................................................... 36

1.    Notice To Potential Class Members Should Be Handled By A Third-Party Administrator ......................................................... 36

2.    Plaintiff's Request For Information Other Than Potential Class Members' Last Known Addresses Is Overbroad And Unnecessary ....... 37

3.    The Proposed Posting Of Notice In Marshalls Stores Is Unnecessary And Overreaching .................................................... 38

CONCLUSION ....................................................................... 40

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amendola v. Bristol-Myers Squibb Co.*
  558 F. Supp. 2d 459 (S.D.N.Y. 2008).................................................................... 17, 31

*Anglada v. Linens N' Things*
  No. 06 Civ. 12901 (CM) (LMS), 2007 U.S. Dist. LEXIS 39105 (S.D.N.Y.
  Apr. 26, 2007)............................................................................................................ 35

*Archibald, et al. v. Marshalls of MA, Inc., et al.*
  Case No. 1:09-cv-2323 (LAP)..................................................................................... 1

*Bernard v. Household Int'l, Inc.*
  231 F. Supp. 2d 433 (E.D. Va. 2002) ........................................................................ 34

*Camper v. Home Quality Mgmt., Inc.*
  200 F.R.D. 516 (D. Md. 2000) ................................................................................... 35

*Chowdhury v. Duane Reade, Inc.*
  No. 06 Civ. 2295 (GEL), 2007 U.S. Dist. LEXIS 73853 (S.D.N.Y. Oct. 2,
  2007) ........................................................................................................................... 30

*Cohen v. Gerson Lehrman Group, Inc.*
  686 F. Supp. 2d 317 (S.D.N.Y. 2010)........................................................................ 30

*Damassia v. Duane Reade, Inc.*
  No. 04 Civ. 8819 (GEL), 2006 U.S. Dist. LEXIS 73090 (S.D.N.Y. Oct. 4,
  2006) ............................................................................................................... 2, 28, 30

*Diaz v. Electronics Boutique of America, Inc.*
  No. 04-CV-0840 (Sr), 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y., Oct. 17,
  2005) ...........................................................................................................2, 18, 19, 31

*Eng-Hatcher v. Sprint Nextel Corp.*
  No. 07 Civ. 7350 (BSJ), 2009 U.S. Dist. LEXIS 127262 (S.D.N.Y. Nov. 13,
  2009) ............................................................................................................... 17, 20, 34

*Fasanelli v. Heartland Brewery, Inc.*
  516 F. Supp. 2d 317 (S.D.N.Y. 2007)........................................................................ 38

*Fengler v. Crouse Health Found., Inc.*
  595 F. Supp. 2d 189 (N.D.N.Y. 2009)........................................................................ 32

*Francis v. A&E Stores, Inc.*
  No. 06 Civ. 1638 (CS)(GAY), 2008 U.S. Dist. LEXIS 83369 (S.D.N.Y. Oct.
  15, 2008) ............................................................................................................... 30, 31

*Gordon, et al. v. Kaleida Health, et al.*
  08-CV-378S, 2009 U.S. Dist. LEXIS 95729 (W.D.N.Y. Oct. 14, 2009) .................... 38, 39

*Hintergerger, et al. v. Catholic Health Sys., et al.*
  08-CV-380S, 2009 U.S. Dist. LEXIS 97944 (W.D.N.Y. Oct. 21, 2009) .................... 38, 39

*Hoffman v. Sbarro*
  982 F. Supp. 249 (S.D.N.Y. 1997) ............................................................................. 19

## TABLE OF AUTHORITIES
### (continued)

Page

*Hoffman-LaRoche, Inc. v. Sperling*
   493 U.S. 165 (1989)................................................................................ passim

*Holt v. Rite Aid Corp.*
   33 F. Supp. 2d 1265 (M.D. Ala. 2004) ..................................................... 20, 31

*Horne v. United Servs. Auto. Ass'n*
   279 F. Supp. 2d 1231 (M.D. Ala. 2003) ................................................... 16, 40

*In re Wells Fargo*
   571 F.3d 953 (9th Cir. 2009) ......................................................................... 28

*Indergit v. Rite Aid Corp.*
   No. 08 Civ. 9361 (PGG), 08 Civ. 11364 (PGG), 2010 U.S. Dist. LEXIS
   60202 (S.D.N.Y. June 15, 2010) ....................................................... 22, 30, 31

*J.S., et al. v. Attica Central Schools*
   No. 00-CV-513S, 2006 U.S. Dist. LEXIS 12827 (W.D.N.Y. Mar. 7, 2006)...................... 37

*Karvaly v. eBay, Inc.*
   245 F.R.D. 71 (E.D.N.Y. 2007).............................................................. 38, 39

*Laroque v. Domino's Pizza, LLC.*
   557 F. Supp. 2d 346 (E.D.N.Y. 2008) ............................................................ 33

*Lewis, et al. v. Wells Fargo & Co.*
   669 F. Supp. 2d 1124 (N.D. Cal. 2009) .......................................................... 37

*Mendoza v. Casa de Cambio Delgado, Inc.*
   No. 07CV2579(HB), 2008 U.S. Dist. LEXIS 61557 (S.D.N.Y. Aug. 12,
   2008) ................................................................................................ 28, 29

*Mike v. Safeco Ins. Co. of Am.*
   274 F. Supp. 2d 216 (D. Conn. 2003)..........................................16, 18, 21, 31

*Monger v. Cactus Salon & Spa's LLC*
   No. 08-CV-1817, 2009 U.S. Dist. LEXIS 60066 (E.D.N.Y. July 6, 2009) ........................ 34

*Morales v. Plantworks, Inc.*
   No. 05 Civ. 2349 (DC), 2006 U.S. Dist. LEXIS 4267 (S.D.N.Y. Feb. 1, 2006).................. 33

*Nerland v. Caribou Coffee Company, Inc.*
   564 F. Supp. 2d 1010 (D. Minn. 2007) ...................................................... 27, 28

*Odem v. Centex Homes*
   No. 3:08-CV-1196-L, 2010 U.S. Dist. LEXIS 9496 (N.D. Tex. Feb. 3, 2010) .................. 21

*Pac. Gas & Elec. Co. v. Pub. Util. Comm'n*
   475 U.S. 1 (1986)...................................................................................... 39

*Ramirez v. Yosemite Water Co., Inc.*
   20 Cal. 4th 785 (1999) ................................................................................ 25

*Ray v. Motel 6 Operating, Ltd. P'ship*
   No. 3-95-828, 1996 U.S. Dist. LEXIS 22565 (D. Minn. Feb. 15, 1996)........................ 36

# TABLE OF AUTHORITIES
## (continued)

Page

*Reich v. Homier Distributing Company, Inc.*
  362 F. Supp. 2d 1009 (N.D. Ind. 2005) ........................................................................ 21

*Robinson, et al. v. Empire Equity Group, Inc.*
  No. WDQ-09-1603, 2009 U.S. Dist. LEXIS 107607 (D. Md. Nov. 18, 2009).................. 37

*Saleen v. Waste Mgmt., Inc.*
  649 F. Supp. 2d 937 (D. Minn. 2009) .......................................................................... 21

*Scholtisek v. Eldre Corp.*
  229 F.R.D. 381 (W.D.N.Y. 2005) ........................................................................... 28, 29

*Severtson v. Phillips Beverage Co.*
  137 F.R.D. 264 (D. Minn. 1991) ................................................................................. 26

*Shajan, et al. v. Barolo, Ltd., et al.*
  No. 10 Civ. 1385 (CM), 2010 U.S. Dist. LEXIS 54581 (S.D.N.Y. June 2,
  2010) ...................................................................................................................... 38, 39

*Sheffield v. Onus Corp.*
  211 F.R.D. 411 (D. Ore. 2002) .................................................................................... 26

*Smith v. Heartland Automotive Services, Inc.*
  404 F. Supp. 2d 1144 (D. Minn. 2005) ........................................................................ 28

*Smith v. Tradesmen Int'l, Inc.*
  289 F. Supp. 2d 1369 (S.D. Fla. 2003) ........................................................................ 33

*Wang v. Chinese Daily News, Inc.*
  231 F.R.D. 602 (C.D. Cal. 2005).................................................................................. 28

*Williams v. Accredited Home Lenders, Inc.*
  No. 1:05-CV-1681-TWT, 2006 U.S. Dist. LEXIS 50653 (N.D. Ga. July 25,
  2006) ........................................................................................................................ 17

*Wooley v. Maynard*
  430 U.S. 705 (1977)................................................................................................... 39

*Yaklin v. W-H Energy Servs., Inc.*
  No. C-07-422, 2008 U.S. Dist. LEXIS 36572 (S.D. Tex. May 2, 2008)........................... 33

*Zhao v. Benihana, Inc.*
  No. 01 Civ. 1297 (KMW), 2001 U.S. Dist. LEXIS 10678 (S.D.N.Y. May 7,
  2001) ................................................................................................................... 28, 29

## STATUTES

29 C.F.R. § 541 ........................................................................................................... 18

29 C.F.R. § 541.100(a) ................................................................................................. 18

29 C.F.R. § 541.102...................................................................................................2, 18

29 C.F.R. § 541.106(a) ................................................................................................. 18

29 C.F.R. § 541.106(b) ..............................................................................................2, 18

**TABLE OF AUTHORITIES**
(continued)

Page

29 C.F.R. § 541.200(a) ........................................................................... 18

29 C.F.R. § 541.202(b) ........................................................................... 20

29 C.F.R. § 541.700(c) ........................................................................ 2, 18

29 C.F.R. § 541.708 ................................................................................ 25

29 U.S.C. § 213(a)(1) ............................................................................. 17

**OTHER AUTHORITIES**

69 Fed. Reg. 22122 (Apr. 23, 2004) ........................................................ 18

**RULES**

Fed. R. Evid. 602, 802 ............................................................................ 33

## PRELIMINARY STATEMENT

On the strength of a few template affidavits and a memorandum focused blindly on the "lenient" standard for class certifications, Plaintiff Martin Guillen requests extraordinary relief that would dramatically transform the scope and burden associated with this wage and hour dispute.  Citing "uniform corporate policies and procedures" Plaintiff claims to be "similarly situated" to thousands of Assistant Store Managers ("ASMs") employed in over 820 Marshalls retail stores across 43 states.  Having deposed Plaintiff and two of his proposed witnesses,[1] however, the evidentiary record is clear:  Plaintiff does not base this statutory claim on Marshalls' "uniform policies."  Rather, Plaintiff claims that, "[d]espite Defendant's 'idealized' job description" and other policies, "ASMs in fact spent the majority of their time performing non-managerial duties."  (Pl.'s Mot. 10 (citing Pl.'s Aff. ¶ 7) (emphasis added).)  In other words, while Marshalls' policies and procedures expressly contemplate an exempt managerial role for ASMs, Plaintiff argues that "in fact" *his* store manager did not allow him to perform such supervisory functions.  Thus, there is no uniform unlawful policy to tie together a nationwide class of ASMs.

Plaintiff's invitation to consider his own individual circumstances also underscores the fundamental flaw in his request to certify a national class:  this will inevitably result in thousands of individualized inquiries involving the unique circumstances of other ASMs around the country.  Both courts and the United States Department of Labor ("DOL") have advised that determining whether an employee is exempt "is extremely individual and fact-intensive, requiring 'a detailed analysis of the time spent performing [managerial] duties' and 'a careful factual analysis of the full range of the employee's job duties and responsibilities.'"  *Diaz*

---

[1]   Nicole Archibald and Ellen Ogaian are both named plaintiffs in the companion case, *Archibald, et al. v. Marshalls of MA, Inc., et al.*, Case No. 1:09-cv-2323 (LAP), which has been consolidated with this litigation for pre-trial purposes.

*v. Electronics Boutique of America, Inc.*, No. 04-CV-0840 (Sr), 2005 U.S. Dist. LEXIS 30382, at *10 (W.D.N.Y., Oct. 17, 2005); *see* 29 C.F.R. § 541.102.  This is particularly true in the retail setting, where the DOL has recognized <u>by regulation</u> that assistant managers may spend more than 50% of their time performing nonexempt work, such as running a register, but nonetheless be properly classified as exempt.  *See* 29 C.F.R. §§ 541.700(c), 541.106(b).  For these reasons, courts generally certify collective actions addressing the exempt status of retail managers only where there is concrete evidence, such as an admission from a corporate representative, that manager duties are consistent from store to store.  *See, e.g., Damassia v. Duane Reade, Inc.*, No. 04 Civ. 8819 (GEL), 2006 U.S. Dist. LEXIS 73090, at *17-18 n.9 (S.D.N.Y. Oct. 4, 2006).  No such evidence exists here.  To the contrary, Marshalls stores are not uniform outfits governed by a planogram.  The stores vary dramatically in size, volume and even merchandise and ASMs use store-specific knowledge of their customers and employees to manage key departments in multi-million dollar stores.

The "leniency" of the so-called "conditional certification" standard should not obscure this Court's obligation, consistent with Supreme Court direction, *see Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165 (1989), to determine whether this case is "appropriate" for treatment as a collective action.  Plaintiff must at least propose a theory that would permit this case, conceivably, to be managed on a representational basis.  Plaintiff has not, offering only boilerplate, conclusory affidavits from former ASMs concerning a few stores in the New York metropolitan area.  Far more is required to warrant conditional certification of a broad nationwide class.  In the absence of any evidence beyond anecdotal, template declarations from a few ASMs regarding their individual work experiences at only a handful of stores, Plaintiff has failed to meet his burden of proof and thus his Motion should be denied.

## STATEMENT OF RELEVANT FACTS

**I.    THE PARTIES TO THIS LITIGATION, AND THEIR CONTRASTING VIEWS OF THE ASM ROLE WITHIN MARSHALLS STORES.**

**A.    Defendants' Management Structure And Retail Operations.**

Defendant Marshalls of MA, Inc. ("Marshalls"), Plaintiff's former employer, has a corporate headquarters in Framingham, Massachusetts. (*See* Affidavit of Maryann Parizo, hereinafter "Parizo Aff." ¶ 3.)  Marshalls divides the country into three zones and employs corporate staff within each zone to support operations and associate relations. (Parizo Aff. ¶ 6.) Marshalls maintains eight regions. (Parizo Aff. ¶ 7.)  Each region is divided into separate districts, typically comprised of ten to twelve stores. (Parizo Aff. ¶ 8.)  There are seventy-six districts in the United States. (Parizo Aff. ¶ 7.)  In each district, a district manager supports the store managers and assistant store managers. (Parizo Aff. ¶ 8.)  Finally, each Marshalls store employs a store manager and, depending upon a variety of operational factors, at least two ASMs. (Parizo Aff. ¶ 9.)

**B.    ASM Job Descriptions And Training.**

Marshalls maintains job descriptions for ASMs, which establish general guidelines regarding the managerial responsibilities ASMs are expected to perform as their primary duty. (Parizo Aff. ¶ 19.)  Marshalls employs two different types of ASMs, "Operations" and "Merchandise," both of whom report to the store manager. (Parizo Aff. ¶ 11.)  To clarify store management expectations, Marshalls promulgates guidelines outlining the respective duties of store managers and ASMs. (Parizo Aff. ¶ 17, Ex. 3.)  The Operations ASM and Merchandise ASMs both "manage[] in-store operations which, includes customer service, recruiting, interviewing, hiring, training and associate development." (*See* Parizo Aff. ¶ 17, Ex. 3 at TJX249-250.)  The Merchandise ASM "oversees the efficient operation of merchandising

standards and presentation, operational functions and key areas such as frontline, layaway and cash office [and] [a]ssists in managing key areas such as maintenance and back room functions." The Operations ASM "[o]versees the efficient operation of key areas such as cash office, maintenance and backroom functions [and] [a]ssists in managing merchandising standards and presentations." (Parizo Aff. ¶ 17, Ex. 3 at TJX249-250.)

Upon hire, ASMs learn how Marshalls stores operate and receive guidance concerning management expectations. (Parizo Aff. ¶ 18; Affidavit of Lisa A. Schreter, hereinafter "Schreter Aff.", Ex. M.) During their annual performance reviews, ASMs are evaluated on their leadership and management skills, and by how they have contributed to the success of the retail store's operations. (Parizo Aff. ¶ 21, Ex. 6 at TJX536-537.)

### C.    ASMs' Management Duties And Responsibilities.

Typically, each store will have one Operations ASM and up to seven additional Merchandise ASMs depending on store size and volume. (Parizo Aff. ¶ 12.) Reporting directly to the ASMs are coordinators, a non-exempt position. (Parizo Aff. ¶¶ 12-13; Schreter Aff., Ex. M at 25.) There are different types of coordinators within the stores including merchandising coordinator, backroom coordinator, customer service coordinator and administrative coordinator. (Parizo Aff. ¶ 13.) Below the coordinators are the non-exempt associates who work in departments throughout the store. (Parizo Aff. ¶¶ 14-15, Ex. 1.) ASMs are responsible for evaluating the performance of the coordinators and associates under their supervision. (Parizo Aff. ¶¶ 19-20.)

Marshalls expects all ASMs to manage their respective departments, coordinators and associates as their primary duty. (Parizo Aff. ¶ 19.) Those managerial functions include all of the duties conventionally associated with managing a team of employees, such as recruiting, interviewing, and training new employees, making recommendations regarding hiring, discipline

and termination, planning and directing the work, evaluating performance, scheduling work hours, handling complaints and grievances, apportioning work, controlling the flow of merchandise, monitoring compliance with company policy and procedure and legal compliance measures.  (Parizo Aff. ¶ 19.)

Depending upon their assigned role within each store, ASMs have varying responsibilities.  (Parizo Aff. ¶¶ 24-27.)  Each store's Operations ASM is tasked with monitoring the back-end (receiving) and the front-end (customer service/check out area) and operational tasks, such as store hiring, associate scheduling, and human resources.  (Schreter Aff. Ex. D, hereinafter "Farruggia Decl." ¶ 7.)  Some larger stores, such as Rego Park, New York, have a separate ASM responsible for overseeing the customer service/check out area.  (Schreter Aff. Ex. F, hereinafter "Gucciardo Decl." ¶ 7.)   Merchandise ASMs are typically assigned to a department – either shoes, men's and children's apparel, women's apparel, or home goods – and are responsible for all operational aspects of the department, including merchandise flow, presentation of sales floor, and customer service.  (Gucciardo Decl. ¶ 3.)  Some ASMs, such as in the Bronx store,[2] are responsible for multiple departments, *e.g.*, shoes and home goods.  (Schreter Aff. Ex. C, hereinafter "Cepa Decl." ¶ 4.)  Also, some stores have additional ASMs; for example, in Rego Park there is an Overnight ASM who oversees the receipt and processing of newly arrived merchandise.  (Gucciardo Decl. ¶ 7.)  Each department has distinct needs with regard to associate supervision, merchandise presentation and customer service.

ASMs supervise varying numbers of associates depending on their particular circumstances.  For example, Operations ASM Sal Farruggia in Westbury, New York, directly supervises 15-20 associates plus 2 coordinators.  (Farruggia Decl. ¶ 8.)   Luis Cepa, a

---

[2]  The Bronx store is also referred to as "Co-op City."  (Guillen Dep. 78:23-79:3.)

Merchandise ASM at the Bronx store, directly supervises 11 associates and 2 coordinators. (Cepa Decl. ¶ 6.) Bernard Gucciardo and Mary Marciniak, both Merchandise ASMs in Rego Park directly supervise 16 and 9 employees respectively. (Gucciardo Decl. ¶ 5; Schreter Aff. Ex. E, hereinafter "Marciniak Decl." ¶ 3.) The number of assigned associates directly impacts an ASM's workload and responsibilities, as the more associates an ASM supervises, the more time they must spend on directing work, training, evaluating, coaching, and counseling.

ASM duties further differ based on whether and how often an ASM serves as "Manager on Duty" ("MOD"), *i.e.*, responsible for the entire store when the store manager is not present. In the Bronx store, the opening ASM decides who to schedule as MOD. (Cepa Decl. ¶ 13.) In Rego Park, the most senior ASM typically serves in this role. (Gucciardo Decl. ¶ 8.) In Westbury, MOD duties are shared. (Farruggia Decl. ¶ 18.)

An ASM's duties will also vary based on the store in which they work. Unlike other retailers, Marshalls does not employ "planograms" and its stores are in many ways different from one another. (Parizo Aff. ¶ 23.) At Marshalls, ASMs are expected to act as merchants who use their store-specific knowledge of their customers and employees to manage key departments in multi-million dollar retail stores. (Parizo Aff. ¶ 23.) Unlike other retailers, Marshalls relies upon its Merchandise ASMs to act independently after considering store-specific factors to customize the selection and display of merchandise in such a way as to maximize the sale of goods to meet the customer traffic and purchasing patterns of their stores. (Parizo Aff. ¶ 23.) In addition, the stores vary dramatically across the country in a variety of significant ways which directly impact operations, including:

- Store Volume: Annual sales volume of Marshalls stores varies dramatically. Some stores have store sales volumes below $4 million while other stores exceed $15 million.

- <u>Head Count</u>:  The number of associates varies dramatically depending on the size and sales volume of the Marshalls store.  Some stores have as few as thirty (30) associates while other stores can have as many as one hundred fifty (150).

- <u>Store Location</u>:  Marshalls stores may be located in an urban setting like Manhattan while others are in a mall in the suburbs.  Some are in a plaza or strip mall while others take most of a city block.

- <u>Size of Store</u>:  Marshalls stores vary in size.  Some have maximum selling square footage which is less than ten thousand square feet while some "Superstores" can be five times larger, over fifty thousand square feet.

- <u>Backroom Variance</u>:  Some Marshalls stores have multi-level backrooms which complicate operations.

- <u>Entrance and Point of Sale</u>:  Some Marshalls stores have more than one entrance and often times more than one location for point of sale.  This makes operations much more complex.

- <u>Overnight Crew</u>:  Some Marshalls stores must have an early morning and overnight crew due to store volume or building restrictions.  Some stores in urban areas cannot receive truck deliveries except at night due to city restrictions.

(Parizo Decl. ¶ 23.)  Store sales volume, as an example, significantly impacts how a store operates, thus affecting an ASM's daily routine.  Sales volume dictates the number of associates per store; the greater a store's revenue, the higher the store's labor budget and the more Associate hours available.  (Cepa Decl. ¶ 9.)  Thus, two stores of the same square footage, with the same number of ASMs, can have different levels of Associate support.  For example, the Rego Park store generates annual revenue of approximately $27 million with over 100 associates, while the Westbury store generates approximately $15 million in revenue with 60-70 associates.  (Gucciardo Decl. ¶ 6; Farruggia Decl. ¶ 5.)  As a result, the Rego Park store has far more associates to supervise and direct.  Moreover, busier stores with higher customer traffic and sales volume require more customer service and inventory deliveries, which affect the amount of time ASMs spend supervising the delivery of customer service and the activities of the backroom coordinator and associates in processing and moving merchandise to the sales floor.

Even the most basic store operations differ by location.  For example, a key function for many ASMs is the supervision of the flow of merchandise from the delivery truck to the sales floor.  The frequency and manner of merchandise deliveries, however, vary by store and affect an ASM's duties:

- <u>Bronx</u>:  Merchandise is delivered <u>three</u> days a week.  A trailer is delivered to the stockroom, where it is unloaded by associates and divided for processing.  The merchandise is then opened, marked, alarmed and brought out to the floor that same day, *i.e.*, "door to floor." (Cepa Decl. ¶ 16.)

- <u>Hartsdale</u>:  Merchandise is delivered <u>four</u> days a week.  Associates unload and unpack the boxes, place the merchandise on the appropriate displays (*e.g.*, hangers, racks), and apply security tags.  Merchandise received should be out on the sales floor within 8 hours.  Hartsdale is unusual in that the stockroom is a level below the sales floor and, as a result, merchandise must regularly be transferred between the stockroom and sales floor.  (Schreter Aff. Ex. B, hereinafter "Nunez Decl." ¶¶ 20-22.)

- <u>Rego Park</u>:  Merchandise is delivered <u>five</u> days a week.  The delivery truck arrives in the morning and delivers a trailer full of merchandise.  The "door to floor" process does not apply.  Rather, the merchandise remains in the trailer during the day, and is then unloaded at night between 10:00 p.m. and 6:00 a.m.  An Overnight ASM oversees associates performing the delivery and unloading process.  Despite its high revenue, the Rego Park store has an unusually small stockroom; it is imperative that all new merchandise is processed by morning when the next day's truck is scheduled to arrive.  (Gucciardo Decl. ¶¶ 15-16.)

- <u>Westbury</u>:  Merchandise is delivered <u>two</u> days a week.  The Operations ASM oversees and directs a receiving team made up of seven associates that is responsible for unloading the truck and processing the merchandise.  Because merchandise arrives so infrequently, rather than applying "door to floor," merchandise is unloaded, processed, and brought out to the floor over the course of several days.  (Farruggia Decl. ¶¶ 9-11.)

Depending upon the particular store and the ASM assignment, accordingly, ASMs can spend a lot or very little time overseeing the backroom coordinator, who, in turn, oversees the delivery and processing of new merchandise.  (Parizo Aff. ¶ 30.)

### D.     The Named Plaintiff And His Evidence.

#### 1.     Plaintiff Martin Guillen.

Guillen accepted employment as a Merchandise ASM in September 2007.[3] (Schreter Aff. Ex. A, hereinafter "Guillen Dep." 20:13-15, June 8, 2010.)  During the initial weeks of his employment, Guillen learned all facets of Marshalls' retail operations, including the front line (sales transactions), the service desk, cash office, layaway, receiving, processing, and merchandising.  (Guillen Dep. 236:9-240:24, 242:19-243:3.)  Guillen worked in the Bronx store[4] with three additional ASMs who reported to the Store Manager, Franklin Martos.  (Guillen Dep. 78:23-79:7.)   The store employed eight coordinators, and approximately sixty associates. (Guillen Dep. 81:11-14, 164:8-9.)  The merchandise coordinator, as well as associates within his departments, reported directly to Guillen.  (Guillen Dep. 145:6-13; Parizo Aff. Ex. 1.)

Consistent with the Marshalls job description, Guillen understood that he was responsible for merchandising the sales floor, training, and delegating work to associates within four departments.  (Guillen Dep. 114:7-18, 130:4-7.)  Guillen was responsible for managing the flow of merchandise from the stock room out to the sales floor in his departments, and using his discretion to present inventory on the sales floor in a manner that would enhance sales.  (Guillen Dep. 198:2-199:22, 297:16-299:11.)  In fact, Guillen testified that he was also responsible for identifying merchandising opportunities and challenges within his departments analyzing sales activity, and providing feedback to the store and district manager.  (Guillen Dep. 199:16-22, 204:14-20.)  His managerial responsibilities included maintaining floor operational standards, supporting the store's asset protection programs and initiatives, managing the markdown

---

[3]  In August 2008, Guillen was terminated for inappropriately marking down the price on items in the Bronx store.  (Guillen Dep. 29:14-30:9, 353:23-354:19.)
[4]  The Bronx store generated approximately $16 million in annual revenue.  (Archibald Dep. 133:11-17.)

process, and developing the employees under his supervision by giving instruction and guidance; he also reviewed and approved work performed by outside vendors, and ensured the safety of employees and customers.   (Guillen Dep. 205:3-12, 210:5-211:19, 261:13-266:3, 307:9-14; Parizo Aff. Ex. 7; Guillen Dep. 309:15-311:3 (referencing Parizo Aff. Ex. 3 at TJX263-271) (Guillen confirms that he was responsible for performing all of the duties associated with the Merchandise ASM position); Guillen Dep. 314:1-15 (referencing Parizo Aff. Ex. 2 at TJX004-005.))  Consistent with the Marshalls job description, Guillen conducted performance reviews of associates (Guillen Dep. 217:24-219:3, 266:11-268:24, 270:9-271:3; Schreter Aff. Ex. N at TJX642-655), and interviewed candidates for employment, making recommendations to hire (or not to hire).   (Guillen Dep. 248:11-252:23, 279:17-280:11; Schreter Aff. Ex. O at TJX969.)   At least twice a week, Guillen was responsible for opening the store, and on those days he would be the "Manager on Duty" (MOD) for five to six hours.[5]   (Guillen Dep. 167:7-15, 171:1-8.)

Despite his understanding of his responsibilities, Guillen challenges his exempt status based upon his feeling that he could not perform his managerial duties as expected because of "the lack of associates."   (Guillen Dep. 240:20-24.)   Although "hired as an assistant manager[,]" he claims he "was mostly on the sales floor."  (Guillen Dep. 35:17-20, 146:19-21 ("I was too busy doing all the things rather than my managerial duties.").)  Guillen blames customer pressure for keeping him from accomplishing what he wanted to do as a manager, and he did not believe that staffing levels were appropriate,[6] which meant he had to be on the sales floor "performing the associates' duties."  (Guillen Dep. 151:18-152:7, 259:10-13.)  Guillen testified

---

[5]  Two or three weeks out of every month, Guillen also worked on Sunday, when he would be the MOD for at least five hours.  (Guillen Dep. 171:13-22, 172:21-173:6.)  He closed the store at least twice a week, when he would be the MOD for three hours.  (Guillen Dep. 174:3-10.)

[6]   Guillen testified that staffing at the store level was based on generated revenue, and accordingly, it was necessarily dependent upon the size of the store, customer traffic, geographical location, and other factors.  (Guillen Dep. 55:8-22; Parizo Aff. ¶ 29.)

that he spent the majority of his time doing what he describes as "associate" work, including running the cash register, store recovery, cleaning, processing merchandise, and folding and sizing items.[7]   (Guillen Dep. 369:15-373:5.)  As Guillen testified, "I was responsible for a lot of stuff that I needed to do, but did I do it, no, I couldn't perform."  (Guillen Dep. 390:19-21.) Guillen believes he was not performing his duties as an ASM because of the way the store manager ran the store; it was "his way or no way."  (Guillen Dep. 39:7-21.)

> ### 2.   Ellen Ogaian's And Nicole Archibald's Testimony, And The Affidavits Filed By Zobeyda Morales And Lady Diana Santillan.

Plaintiff's co-claimants, Ellen Ogaian ("Ogaian") and Nicole Archibald ("Archibald"), offer the same arguments in support of their claim that they were improperly considered exempt managerial employees during their tenure as ASMs.   Although they understood that they were primarily responsible for supervising associates and store operations, they claim their store managers or customer pressure prevented them from exercising these duties.

Ogaian was employed for just over one year[8] as an Operations ASM in a Marshalls store in Hartsdale, New York.[9]   (Schreter Aff. Ex. L, hereinafter "Ogaian Dep." 40:14-18, June 3, 2010; Schreter Aff. Ex. P at TJX471-475.)   She worked with two other ASMs in Hartsdale for the majority of her tenure, and they all reported to Store Manager Candi Ryan. (Ogaian Dep. 44:18-45:5, 80:4-23, 83:2-13.)   Like Guillen, Ogaian was responsible for opening the store three to four times a week, and closing the store two to three times a week.   (Ogaian

---

[7]  At the same time, Guillen concedes that as an ASM, he was often called upon to do two things at once, and that he was good at multi-tasking.  (Guillen Dep. 311:11-312:15.)  He always knew that he should require associates to do the work out on the sales floor.  (Guillen Dep. 350:2-19.)

[8]  Ogaian's employment was terminated when it was discovered that she was manually changing employee timecards in order to meet her payroll budget.  (Ogaian Dep. 242:3-7; Schreter Aff. Ex. P at TJX471-475.)

[9]  The Hartsdale store generated between $12 million and $14 million annually.  (Ogaian Dep. 78:4-15.)

Dep. 63:19-64:2.)  Ogaian admits that she was responsible for scheduling all associates in the store on a weekly basis (Ogaian Dep. 51:6-10), and she agreed that she was trained on all the supervisory functions associated with the store's operations.  (Ogaian Dep. 56:7-60:6, 63:9-16, 73:7-77:14.)  From Ogaian's perspective, however, that "didn't turn out to be what [she] did, you know, in the real world[.]"  (Ogaian  Dep. 56:13-14.)

Ogaian blames the Store Manager, Candi Ryan, for her inability to discharge her managerial duties; Ogaian called her "god . . . because we [referring to the ASMs] really had no say so in anything."  (Ogaian Dep. 83:2-5.)  She complains extensively about Ryan's management style and its impact on her duties as an ASM.  (Ogaian Dep. 95:21-96:20, 177:6 ("[T]he woman was impossible.  She was impossible."), 180:10-15 ("I thought I knew how to make a schedule correct. . . She would change it.  It's okay.  She's god.  She changed everything, change it, change it, change it."), 190:11-14 ("[I]f I made a suggestion, even to put candies up here in the front, . . . Candi would say, well, no, that's not what I want[.]"), 221:19-222:5 (when asked whether she developed strategies to drive sales, Ogaian responds "I wouldn't even say anything to [Ryan] because it was the way she did it, and that was it.").)

Likewise, Archibald (who was employed as a Merchandise ASM in the Bronx store with Guillen, (Schreter Aff. Ex. K, hereinafter "Archibald Dep." 132:13-18, June 2, 2010)) complains about the manner in which Store Manager Martos supervised the store.  (Archibald Dep. 20:2-22 (Archibald complained weekly that Martos routinely failed to complete the managers' schedule), 138:16-20 (complaints about the manner in which Martos treated the ASMs, "he never took blame. . . . Everything was always on the [ASMs].").)  Like Guillen, Archibald understood her responsibilities to include supervising stock associates in the backroom (Archibald Dep. 67:3-9), ensuring that the retail floor was properly recovered each day

(Archibald Dep. 69:8-13, 156:16-22), evaluating Associate performance (Archibald Dep. 86:18-20), securing the store during opening and closing (Archibald Dep. 92:16-23), supervising the front line and service desk (Archibald Dep. 99:13-22, 101:12-20), supervising payroll and employee timekeeping (Archibald Dep. 111:19-112:17), auditing the registers (Archibald Dep. 115:6-23), opening and/or closing the store (Archibald Dep. 157:7-158:23), participating in hiring (Archibald Dep. 168:1-171:17, 174:4-18), counseling and disciplining associates (Archibald Dep. 187:7-188:2, 198:24-200:14), identifying merchandising opportunities within her departments (Archibald Dep. 226:1-228:2), and addressing customer concerns.  (Archibald Dep. 236:17-238:15.)   She simply complains that pressures within the store and Manager Martos' failure to effectively allocate staff resulted in her spending the majority of her time on the sales floor.  (Archibald Dep. 426:7-24, 427:1-15, 433:1-12.)

       Plaintiff's Motion also attaches affidavits from Zobeyda Morales and Lady Diana Santillan, both former ASMs in New York who disclaim managerial responsibility despite "idealized" job descriptions.[10]   Notwithstanding these disclaimers, both Morales and Santillan regularly noted their personal managerial accomplishments in the self-evaluation section of their performance reviews.  For example, Morales wrote that she would regularly "support others in problem solving," and that she "spent time coaching where appropriate."  (Parizo Aff. Ex. 8 at TJX2789.)  Morales further commented that she "must focus more on developing associates to increase their productivity and to be promoted to the next level."  (Parizo Aff. Ex. 8 at TJX 2797.)

---

[10]   In template format, both witnesses also state that they "spent the majority of time performing non-exempt tasks," that their "job duties were substantially the same as the hourly employees," and that the "majority of the managerial duties in my stores were performed internally by the store manager or externally by the various district and regional managers and/or the corporate headquarters."  (Pl.'s Mot. Ex. 3, hereinafter "Morales Aff." ¶¶ 7-9; Pl.'s Mot. Ex. 5, hereinafter "Santillan Aff." ¶¶ 7-9.)

In her review, Santillan likewise describes herself as "skilled at managing strong and poor performers within the team" and noted that she "rewards initiative, invites input, shares ownership and visibility, brings out the best in others, genuinely cares about people and facilitates problem solving solutions." (Parizo Aff. Ex. 9 at TJX2888.)  Santillan even executed a document entitled "Marshalls Exempt Test For Executive Store Employees" (hereinafter the "Exempt Test"), in which she affirmatively verified that she had all of the following responsibilities in her role as an ASM:

- regularly direct the work of two or more employees or the equivalent.

- have the authority to hire or fire or recommend the hiring or firing of employees under my direction.

- recommend action to be taken in the area of advancement or demotion of employees under my direction.

- primary function is managing a store or an area within a store.  The area I manage consists of three or more departments.

- spend at least 60% of my time in supervisory work.

(Parizo Aff. Ex. 10 at TJX2813.)  In other words, Santillan confirmed her actual responsibilities as an ASM were consistent with management's expectations of this exempt role.[11]

## II.   OTHER ASMS AND NON-EXEMPT ASSOCIATES TESTIFY REGARDING THE ASM'S MANAGERIAL ROLE AND RESPONSIBILITIES.

Notwithstanding the template affidavits submitted by Plaintiff in which he asserts that he and a few other former employees did not perform managerial functions, other ASMs working at the Hartsdale and Bronx stores have testified that they regularly engage in a host of managerial functions including recruiting and hiring (Nunez Decl. ¶¶ 34-37; Cepa Decl. ¶ 27);

---

[11]  Immediately above her signature, Santillan affirmed as follows:  "I testify that all of the above which I have initialed is true and that I have voluntarily taken this test.  If at any time in the future I do not meet the requirements of this test, I will notify my immediate supervisor so that I may be placed on a time clock basis."  (Parizo Aff. Ex. 10 at TJX2813.)

scheduling (Nunez Decl. ¶¶ 24-27); supervising (Nunez Decl. ¶¶ 12-14, 20-21, 48, 67; Cepa Decl. ¶¶ 15, 24, 36); training (Nunez Decl. ¶¶ 38-39; Cepa Decl. ¶ 28); evaluating (Nunez Decl. ¶¶ 40-45; Cepa Decl. ¶ 29); promoting (Nunez Decl. ¶¶ 46-47); and disciplining and terminating subordinates (Nunez Decl. ¶¶ 49-51; Cepa Decl. ¶ 30).

ASMs working at other New York stores, including Westbury and Rego Park, have also stated that they spend the majority of their time performing managerial and supervisory tasks including recruiting and hiring (Farruggia Decl. ¶¶ 7, 27; Marciniak Decl. ¶ 14; Gucciardo Decl. ¶ 27); scheduling (Farruggia Decl. ¶ 8; Marciniak Decl. ¶ 10); supervising (Farruggia Decl. ¶¶ 8, 11, 17, 19; Marciniak Decl. ¶¶ 8-9, 11, 13, 29; Gucciardo Decl. ¶¶ 11, 16, 23, 41); training (Farruggia Decl. ¶ 24; Marciniak Decl. ¶ 15; Gucciardo Decl. ¶ 28); evaluating (Farruggia Decl. ¶ 25; Marciniak Decl. ¶¶ 16-18; Gucciardo ¶ 29); promoting (Marciniak Decl. ¶ 21; Gucciardo ¶ 30); and disciplining and terminating subordinates (Farruggia Decl. ¶¶ 26, 28; Marciniak Decl. ¶¶ 19-20; Gucciardo Decl. ¶ 31).

Moreover, non-exempt coordinators managed by ASMs have testified that ASMs in their stores, including Ogaian herself, regularly supervised and directed them in their work including, but not limited to, recruiting and hiring (Cano Decl. ¶ 9; Cano Decl. II ¶¶ 3, 6; McKoy Decl. ¶ 7; Guscott Decl. ¶¶ 5, 21); scheduling (Cano Decl. ¶ 8; Guscott Decl. ¶ 9); supervising (Cano Decl. ¶¶ 4, 12; Cano Decl. II ¶¶ 5, 8; McKoy Decl. ¶¶ 3-5; Guscott Decl. ¶¶ 6-8, 17, 25); training (Cano Decl. ¶ 11; Cano Decl. II ¶¶ 4, 8; McKoy Decl. ¶ 4; Guscott Decl. ¶¶ 12, 16); evaluating (Cano Decl. ¶ 10; Cano Decl. II ¶ 7; McKoy Decl. ¶ 11; Guscott Decl. ¶ 19); promoting (Cano Decl. II ¶ 7; Guscott Decl. ¶ 16); and disciplining and terminating subordinates. (Cano Decl. ¶ 10; Cano Decl. II ¶ 6; McKoy Decl. ¶¶ 7-8; Guscott Decl. ¶ 18.)

## LEGAL ARGUMENT

I. **PLAINTIFF CANNOT ESTABLISH THAT HE IS "SIMILARLY SITUATED" TO A NATIONWIDE CLASS.**

    A. **Authorization Of Notice Under The FLSA Is Discretionary And Should Only Be Granted In "Appropriate" Cases.**

The FLSA does not expressly – or impliedly – allow judicial intervention through "authorized notice" that Plaintiff seeks in this Motion.  The Act simply permits an individual to bring an action for unpaid overtime on behalf of themselves "and other employees similarly situated."  29 U.S.C. § 216(b).  Whether the Court elects to intervene in these proceedings as Plaintiff requests, therefore, is a matter committed to the Court's sound discretion in the management of its docket.  In *Hoffman-LaRoche, Inc. v. Sperling*, the Supreme Court held that district courts "have discretion, <u>in appropriate cases</u> . . . to implement" the collective action mechanism under Section 216(b) "by facilitating notice to potential plaintiffs."  493 U.S. at 169 (emphasis added); *Horne v. United Servs. Auto. Ass'n*, 279 F. Supp. 2d 1231, 1233 (M.D. Ala. 2003) ("The power to authorize notice must, however, be exercised with discretion and only in appropriate cases").  The Court pointed to the systemic benefits derived from a process that permits the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged . . . activity."  *Hoffman-LaRoche,* 493 U.S. at 170.  "In other words, the court must be satisfied that there is a basis to conclude that questions common to a potential group of plaintiffs would predominate a determination of the merits in this case."  *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003).  Absent the requisite commonality, "it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse."  *Horne*, 279 F. Supp. 2d at 1234.  Certainly, in cases involving literally thousands of potential litigants, courts must carefully scrutinize a plaintiff's claim that notice would actually serve the interests that support judicial intervention.

*See Williams v. Accredited Home Lenders, Inc.*, No. 1:05-CV-1681-TWT, 2006 U.S. Dist. LEXIS 50653 (N.D. Ga. July 25, 2006) (applying "similarity requirement" with "some rigor" in case involving "as many as 1,000 potential plaintiffs"); *Eng-Hatcher v. Sprint Nextel Corp.*, No. 07 Civ. 7350 (BSJ), 2009 U.S. Dist. LEXIS 127262 (S.D.N.Y. Nov. 13, 2009) (considering the potential size and scope of plaintiff's requested class under 29 U.S.C. § 216(b) on a motion for conditional certification).

**B.     The Legal Context Within Which Plaintiff's Overtime Claim Must Be Adjudicated.**

To evaluate Plaintiff's request for judicial notice against the critical touchstones of economy and efficiency, *see Hoffman-LaRoche,* 493 U.S. 165 (1989), this Court must look beyond the ASM job titles, job descriptions, and pay plans to consider how Plaintiff's asserted statutory violation actually will be proven.  *See Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 467 n.9 (S.D.N.Y. 2008) (scrutinizing the merits based on the developed record to the extent necessary to address plaintiff's motion for authorization of notice).   Plaintiff challenges his exempt status under the FLSA, *see* 29 U.S.C. § 213(a)(1), and accordingly, his claims will be evaluated based upon whether the record shows, by a preponderance of the evidence, that he was employed in a bona fide executive or administrative capacity – or a combination of both exemptions.  *Id.*  In the context of a retail assistant manager case, accordingly, the record must be developed to determine whether Plaintiff's (or potentially other ASMs') primary duty consisted of the management of a recognized retail department or subdivision; whether he customarily directed the work of two or more employees; whether he had authority to make recommendations regarding employees' change in status; or alternatively, whether his primary duty included non-manual work related to the management of Marshalls' business, including the exercise of discretion and independent judgment.  *See* 29 C.F.R. §

541.100(a) (describing the requirements of the executive exemption); 29 C.F.R. § 541.200(a) (administrative exemption).

It follows logically that before notice is authorized, Plaintiff must at least present a *plausible* theory that his overtime claim (and perhaps those of hundreds, if not thousands, of other ASMs who will be requested to simply sign a form to join this litigation) can be adjudicated on a representational basis. Both courts and the DOL find that "[d]etermining whether an employee is exempt is extremely individual and fact-intensive, requiring 'a detailed analysis of the time spent performing [managerial] duties' and 'a careful factual analysis of the full range of the employee's job duties and responsibilities.'" *Diaz v. Electronics Boutique of Am., Inc.*, 2005 U.S. Dist. LEXIS 30382, at *10 (quoting *Mike*, 274 F. Supp. 2d at 220); 29 C.F.R. § 541.102 ("[t]he exempt status of any particular employee must be determined on the basis of whether <u>the employee's</u> salary and duties meet the requirements of the regulations." (emphasis added)). This rule applies with even more force in a retail setting, where the DOL also recognizes <u>by regulation</u> that assistant managers may spend more than 50% of their time performing nonexempt work, such as running a register, but nonetheless be properly classified as exempt. *See* 29 C.F.R. § 541.700(c); 29 C.F.R. § 541.106(b) ("An assistant manager can supervise employees and serve customers at the same time without losing the exemption."). *See also* 69 Fed. Reg. 22122 (Apr. 23, 2004) (codified at 29 C.F.R. § 541) (discussing the exempt status of assistant managers in the retail context who spend the majority of their time on nonexempt work). Critically, the Regulations provide that, where an employee performs concurrent duties, "<u>[w]hether an employee meets the requirements</u>" of the exemption is <u>determined on a case-by-case basis</u>. 29 C.F.R. § 541.106(a) (emphasis added). Against this

legal backdrop, Plaintiff must show that his claims present common questions of fact and law that may be answered – conceivably – through representational proof.  He has not done so.

C.  **Plaintiff Has Failed To Submit Sufficient Evidence Of A Nationwide "Violation Of Law" That Could Be Managed Or Tried On A Collective Basis.**

1.  **Plaintiff Attempts To Establish "Victimhood" Based Upon Treatment By His Manager –** *Not* **Marshalls Corporate Policies And Procedures.**

Notice must be premised upon a "factual nexus" between Plaintiff and his proposed "potential plaintiffs," that is "sufficient to demonstrate that [they] together were victims of a common policy or plan that violated the law[.]"  *Diaz*, 2005 U.S. Dist. LEXIS 30382, at *10 (quoting *Hoffman v. Sbarro*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)).  Plaintiff states quite plainly in his Motion that the Marshalls job descriptions are "idealized"; he certainly does not intend to prove that Marshalls violated the law based upon the duties assigned to ASMs in these documents.  Instead, he argues that, despite these corporate policies and procedures, he performed primarily nonexempt work.  In other words, despite what Marshalls expects and intends ASMs to do, Plaintiff argues that his actual daily duties – as required by *his* store manager – place him outside the exemption.[12]  As a result, there is no common thread to tie together a nationwide class of ASMs; proof of liability will turn not on Marshalls' policies or procedures applicable to the entire proposed class, but rather, on evidence of what each putative class member does on a daily basis, as required by his or her store manager, that is different from what is contained in the descriptions.  *See*, *e.g.*, *Eng-Hatcher*, 2009 U.S. Dist. LEXIS 127262, at

---

[12]  The Affidavits submitted by Morales and Santillan underscore this dichotomy – which requires individual inquiry and testimony.  Both trumpeted their managerial prowess during annual self-evaluations which they completed while ASMs at Marshalls.  (*See* Parizo Aff. Exs. 8-9.)  Santillan even confirmed her exempt status – in writing – based upon her job duties. (Parizo Aff. Ex. 10.)  For Morales and Santillan to suggest in boilerplate affidavits that they had little or no managerial responsibility given their own prior statements is simply not credible, and certainly demonstrates that their *individual* claims should be carefully scrutinized.

*10-11 (denying conditional certification where plaintiff argued that, despite legal compensation and overtime policies, retail defendant employed a "nationwide *de facto* policy" where individual managers compelled employees to work uncompensated overtime).

Similarly, Plaintiff's references to ASM training materials do not establish a violation of law; these documents are not unlawful on their face and do not direct the performance of nonexempt tasks.  Rather, the training materials refer to <u>managerial</u> tasks and <u>leadership</u> strategies.  (Pl.'s Mot. Ex. 2, hereinafter "Archibald Aff." Ex A at 7-8.)  They also discuss and describe essential operational information of which a manager must be aware in order to effectively run the store.  (Archibald Aff. Ex. A at 27-115.)  There is nothing about the training manual or its contents that suggests ASMs perform nonexempt duties.  In fact, the manual includes a summary of ASM responsibilities, all of which are of an exempt nature.  (Archibald Aff. Ex. A at 8.)  The simple fact that a company trains and provides policies and guidelines to new managers surely cannot compromise their exempt status.  Indeed, without knowing company policies and procedures, a manager would be hard-pressed to implement and enforce them.  *See* 29 C.F.R. § 541.202(b) (exempt administrative duties include implementation of management policies and operating practices).

In *Holt v. Rite Aid Corp.*, the plaintiffs sought certification of a collective action consisting of store managers and assistant managers, alleging that they were similarly situated in that they were misclassified as exempt.  33 F. Supp. 2d 1265, 1270 (M.D. Ala. 2004).  Like Plaintiff here, the plaintiffs claimed that, while their job descriptions contained exempt duties, they spent the majority of their time on nonexempt duties, such as running the cash register or performing janitorial duties.  *Id.* at 1271.  In denying certification, the court explained:

> [T]his case is not a case where janitors are being classified as exempt executives.  <u>Evidence before the court of the formal,</u>

<u>written job descriptions of store managers and assistant store managers contains many managerial tasks.  It is only once the Plaintiffs' testimony as to the degree to which other tasks are performed that the application of the exemption becomes questionable.</u>  Therefore, . . . because the application of the executive exemption for merits purposes will require a fact-intensive determination, it appears to the court that the similarly situated inquiry also requires an examination of day-to-day tasks.

*Id.* (emphasis added).

Similarly, in *Mike v. Safeco Ins. Co. of Am.*, another misclassification case, the court denied certification of a collective action, concluding that a determination as to exempt status would require an individualized, fact-intensive analysis of an employee's job duties and responsibilities, *i.e.*, "an ad hoc inquiry for each proposed plaintiff."  274 F. Supp. 2d at 220-21. The court further emphasized that, while the employees in question shared a common job description, the plaintiff disavowed the job description and claimed that, contrary to what the description called for him to perform, he performed primarily nonexempt duties.  *Id.* at 221. Thus, the job description could "not provide the necessary common thread," and the merits of the plaintiff's claim would turn on his actual day-to-day tasks, not upon any company policy or decision.[13]  *Id.  See also Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937, 940-41 (D. Minn. 2009) (denying conditional certification based upon employer's policy of automatically deducting for meal breaks, where plaintiffs' theory of liability was premised upon managers' non-compliance with that otherwise lawful policy).  Here, other ASMs employed in <u>the very same store</u> where Plaintiff worked have testified that they performed their managerial duties in a manner consistent with Marshalls' expectations.  (*See*, *supra*, "Facts," II.)  Plaintiff cannot (and

---

[13]  *See also Reich v. Homier Distributing Company, Inc.*, 362 F. Supp. 2d 1009 (N.D. Ind. 2005) (finding individualized inquiries necessary to determine applicability of exemption so that FLSA collective action certification was inappropriate); *Odem v. Centex Homes*, No. 3:08-CV-1196-L, 2010 U.S. Dist. LEXIS 9496 (N.D. Tex. Feb. 3, 2010) (refusing to certify class of field managers because duties would vary by manager, making the proposed class unmanageable).

does not intend to) establish his status as a "victim" of an FLSA violation by pointing to "standardized corporate policies and procedures"; he intends to rely upon testimony regarding his own personal experience to prove his claim.  Therefore, he is not similarly situated to all ASMs nationwide.

### 2.   Dissimilar Employment Settings Within Marshalls Stores Also Compel Individualized Inquiry.

ASM job duties differ on the most basic level – managerial assignment – as each store has an Operations ASM and multiple Merchandise ASMs who have different areas of responsibility.  (*See, supra*, "Facts," I.B, C; Farruggia Decl. ¶ 7; Gucciardo Decl. ¶ 3.)  And, in some stores there are ASMs with unique responsibilities and in other stores, a single ASM may have responsibility for multiple departments.  (Gucciardo Decl. ¶ 7 (in Rego Park, separate ASMs responsible for overseeing the customer service/check out area and for overnight merchandise processing); Cepa Decl. ¶ 4 (Bronx ASM responsible for multiple departments).)  ASM duties also differ based on whether and how often an ASM serves as MOD responsible for the entire store when the store manager is out.  Practices for determining the MOD differ by store.  (*See* Cepa Decl. ¶ 13; Gucciardo Decl. ¶ 8; Farruggia Decl. ¶ 18.)  Based on area of assignment alone, ASMs will have varying degrees of responsibility with regard to Associate supervision, merchandise presentation, and customer service.

Even ASMs with similar assignments have different day-to-day duties based on the store in which they work.  As opposed to in *Indergit v. Rite Aid Corp.*, No. 08 Civ. 9361 (PGG), 08 Civ. 11364 (PGG), 2010 U.S. Dist. LEXIS 60202 (S.D.N.Y. June 15, 2010), discussed below, where store operations were standardized and planograms were used, Marshalls Stores do not use "planograms" and are in many ways different from one another.  (Parizo Aff. ¶ 23.)  At Marshalls, ASMs are expected to act as merchants who use their store-specific

knowledge of their customers and employees to manage key departments in multi-million dollar retail stores.  (Parizo Aff. ¶ 23.)  Unlike other retailers, Marshalls relies upon its Merchandise ASMs to act independently after considering store-specific factors to customize the selection and display of merchandise in such a way as to maximize the sale of goods to meet the customer traffic and purchasing patterns of their stores.  (Parizo Aff. ¶ 23).  In addition, there are meaningful differences in the way that Marshalls stores operate, based on:  (1) store volume; (2) employee head count; (3) store location; (4) store size; (5) back room variances; (6) cleaning; (7) number of entrances; and (8) the existence or non-existence of overnight crews.  (*See, supra*, "Facts," I.C; Parizo Aff. ¶ 23.)

For example, store sales volume significantly impacts operations, and thus affects an ASM's daily routine.  The greater a store's revenue, the higher the store's labor budget and the more associate hours available.  (Cepa Decl. ¶ 9; Gucciardo Decl. ¶ 6; Farruggia Decl. ¶ 5.)  As a result, stores with high sales volume have far more associates to supervise and direct.  Moreover, busier stores with higher customer traffic and sales volume require more customer service and inventory deliveries, which affect the amount of time ASMs can spend on other tasks.  Each ASM also supervises a different number of employees depending upon his or her particular circumstances; *e.g.*, though both are Merchandise ASMs at the same store, Bernard Gucciardo supervises 16 employees and Mary Marciniak supervises 9 employees.  (Farruggia Decl. ¶ 8; Cepa Decl. ¶ 6; Gucciardo Decl. ¶ 5; Marciniak Decl. ¶ 3.)  The more associates an ASM supervises, the more time he or she must spend directing work, training, evaluating, coaching, and counseling.

Even the most fundamental store operations, such as the frequency and manner of merchandise deliveries, differ by store and can significantly affect ASM responsibilities.  (*See,*

*supra*, "Facts," I.C.)  For example, merchandise delivery varies from two days a week to five days a week; some stores have merchandise unloaded from the truck immediately while others have a trailer dropped at the loading dock allowing more time to complete the processing and transfer of the merchandise to the sales floor; some stores unload and process the merchandise within eight hours of receipt, other stores perform these responsibilities at night, and yet other stores unload and process merchandise over the course of several days; some stores have numerous ASMs direct and supervise the receipt and processing of merchandise, while other stores have one ASM dedicated to these tasks; some stores have small stockrooms and others have large basement stockrooms.  (Cepa Decl. ¶ 16; Nunez Decl. ¶¶ 20-22; Gucciardo Decl. ¶¶ 15-16; Farruggia Decl. ¶¶ 9-11.)  Depending upon the particular store and the ASM assignment, ASMs can spend a lot or very little time overseeing the delivery and processing of new merchandise.

Other store-specific factors that affect ASM responsibilities include the personality and management style of the store manager and the store's customer base.  Each store manager runs his or her store differently.  (*See, supra*, "Facts," I.C; Gucciardo Decl. ¶¶ 9, 20; Farruggia Decl. ¶¶ 22, 35; Cepa Decl. ¶ 22.)  Indeed, Plaintiff and his co-claimants each testified at deposition that their particular store manager allowed very little discretion.  (*See* Guillen Dep. 39:19-21 (it was "his way or no way"); Ogaian Dep. 83:4-5 (referring to manager as "god . . . because we really had no say so in anything").)  Another declarant attests that his store manager affords wide latitude to make managerial decisions.  (Gucciardo Decl. ¶ 9.)  The diversity of ASM work environments makes it impossible to rely upon representative proof to make general inferences as to class members' job duties and establish liability on a class-wide basis.

Marshalls' potential defenses are individualized as well. As detailed above, ASMs have many job responsibilities, some of which fall within the executive exemption and others within the administrative exemption and the combination exemption. (*See, supra*, "Facts," I.B, C.) Which exemption or combinations of exemptions[14] apply will differ by ASM. To the extent a particular ASM claims that he or she does not predominantly perform exempt duties, Marshalls will show that the ASM is not fulfilling job expectations, which can be demonstrated through direct questioning and reference to the particular ASM's personnel documents, such as job evaluations and counseling. For example, counseling and/or discipline of an ASM may show that an ASM who performs primarily nonexempt tasks is not meeting the expectations of the job. *See Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785, 802 (1999) (an employee who is supposed to be engaged in exempt work cannot avoid the exemption due to his or her own substandard performance). Alternatively, a job evaluation might reference exempt duties being performed by the particular ASM in contradiction to the ASM's testimony. Indeed, Morales and Santillan, both of whom submitted declarations on behalf of Plaintiff claiming to have performed little exempt work as ASMs, trumpeted their managerial prowess in annual self-evaluations they completed while ASMs. (*See* Parizo Aff. Exs. 8-9.) This type of documentary evidence only exists on an individualized basis, which requires a fact-intensive inquiry.

### D. In The Absence Of A Common "Illegal" Plan Or Policy, Plaintiff's Proposed Collective Action Is Utterly Unmanageable.

The Supreme Court has identified the main benefit of a collective action as twofold. It gives plaintiffs the advantage of lower individual costs to vindicate rights via the pooling of resources. It also allows for an efficient resolution in one proceeding of common

---

[14]   Manager tasks that fall under any exemption can be <u>combined</u>, or "<u>tacked</u>," for purposes of establishing exempt status. 29 C.F.R. § 541.708 (emphasis added).

issues of law and fact arising from the same alleged activity. *Hoffman-LaRoche*, 493 U.S. at 170. The manageability of Plaintiff's proposed class, therefore, must be considered before notice is authorized. *See Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 266 (D. Minn. 1991) ("as a matter of sound case management, a court should, before [authorizing notice] make a preliminary inquiry as to whether a manageable class exists."). These policy considerations simply do not support authorizing notice here.

First, the pooling of claimants' claims is unnecessary. Plaintiff seeks damages in excess of $21,000, based upon his deposition testimony that he worked up to 60 to 65 unpaid overtime hours – every week.[15] (Guillen Dep. 88:11-14, 112:5-9.) The FLSA is also a fee-shifting statute. As such, an individual FLSA plaintiff can recover attorneys' fees and costs if successful. This is not a case involving a relatively small increment of allegedly unpaid time, such as might be the case in a donning and doffing claim. To the contrary, Plaintiff has alleged he worked substantial overtime for which he claims he is entitled to be paid throughout his employment. (Guillen Dep. 112:5-9.) As a result, the relative value of his claim or that of any other ASM is not contingent upon pooling in order to secure legal representation.

Second, trying this matter as a collective action cannot conceivably result in efficient resolution. Rather, adjudication of the proposed collective action will require this Court to inquire into each putative claimant's day-to-day circumstances and his or her relationship to the store manager to determine his or her exempt status, based on Plaintiff's own theory. *Sheffield v. Onus Corp.*, 211 F.R.D. 411, 413 (D. Ore. 2002) (denying certification where "each claim would require extensive consideration of individualized issues" and "be mired in

---

[15]   Based upon his salary of approximately $1,300/week, and assuming he worked at least 60 hours every week (as he has testified), Guillen has alleging compensatory wage loss of almost $11,000, plus liquidated damages for the approximately 50 weeks he was employed at Marshalls ($1,300/60 hours = $21.67/2 = $10.83 x 20 OT hours x 50 weeks x 2 = $21,666.67).

particularized determinations of liability and damages, rather than collective consideration of common questions of law and fact"). Plaintiff's testimony contrasts with that of other ASMs – even in his own store. His deposition testimony is internally contradictory – and contrasts with the declaration he has filed in support of this Motion. (*See* "Facts," I.D.1.) If the parties must establish a personal record through cross-examination for each proposed claimant, based upon his or her perception of his role contrasted with management's expectations (and the claimant's own performance documentation, *see*, *e.g.*, Parizo Aff. Exs. 8-10, where Santillan and Morales document their managerial responsibilities), the case and the factual and legal issues raised simply cannot be managed collectively.

### E. Judicial Authority Does Not Support Plaintiff's Request For Nationwide Notice.

#### 1. Plaintiff's Cited Authority Do Not Support His Broad Request.

Plaintiff has cited no legal authority to support his broad request for judicial intervention. Relying on *Nerland v. Caribou Coffee Company, Inc.*, 564 F. Supp. 2d 1010 (D. Minn. 2007), Plaintiff contends that Marshalls' uniform classification of its ASMs as exempt estops it from now refuting that ASMs are similarly situated for the purposes of conditional certification. As noted above, Plaintiff does not actually rely on the Marshalls job description to establish a violation of law that binds his proposed class. Further, in granting certification, the *Nerland* court did not focus exclusively on the uniform classification of managers as exempt, but also premised its decision on the fact that the plaintiffs claim that they and putative class members performed the duties listed in their job description, which included many *non-managerial* duties. *Id.* at 1019. The court cautioned that it would not have reached the same result if, as in *Smith v. Heartland Automotive Services, Inc.*, 404 F. Supp. 2d 1144 (D. Minn.

2005), the plaintiffs claimed they did not perform the duties in the job description which would have required "a fact-intensive inquiry into the daily activities of each individual."[16]  *Id.*

Plaintiff cites only one case in support of his request for notice that actually involves retail store managers, and that case is easily distinguished.  *See Damassia v. Duane Reade, Inc.*, No. 04 Civ. 8819 (GEL), 2006 U.S. Dist. LEXIS 73090 (S.D.N.Y. Oct. 4, 2006).  In *Damassia*, the court certified a class of assistant store managers, but did so only on the basis of the defendant's <u>admissions</u> that the company's business practices as to assistant night managers were consistent from store-to-store and that one could draw accurate conclusions about assistant managers nationwide by looking at the plaintiff's store.  *Id*. at *16-18.  The *Damassia* court expressly noted that such concessions distinguished the case from similar cases in which courts have denied certification on the basis that an individualized inquiry would be necessary.  *Id*. at *17 n.9.  Here, Marshalls has made no such concessions.  In fact, it has presented substantial evidence showing that business practices vary from store to store.

The other cases upon which Plaintiff relies – *Scholtisek v. Eldre Corp*., 229 F.R.D. 381 (W.D.N.Y. 2005), *Mendoza v. Casa de Cambio Delgado, Inc.*, No. 07CV2579(HB), 2008 U.S. Dist. LEXIS 61557 (S.D.N.Y. Aug. 12, 2008), and *Zhao v. Benihana, Inc.*, No. 01 Civ. 1297 (KMW), 2001 U.S. Dist. LEXIS 10678 (S.D.N.Y. May 7, 2001) – are inapposite, as they do not address misclassification claims.  Plaintiff relies on *Scholtisek* to argue that his burden to show that others are similarly situated is minimal.  (Pl.'s Mot. 8.)  *Scholtisek* is an off-

---

[16]  Note that the *Nerland* court relied upon questionable precedent.  *See In re Wells Fargo*, 571 F.3d 953, 958-59 (9th Cir. 2009) (reversing *Wang v. Chinese Daily News, Inc.*, 231 F.R.D. 602 (C.D. Cal. 2005), holding that the district court committed reversible error by according the bank's standardized application of exempt status to home mortgage consultants too much weight in its Rule 23(b) predominance analysis).  *Cf. Nerland*, 564 F. Supp. 2d at 1024 (citing positively to *Wang*).  This case offers both questionable and irrelevant support.

the-clock case, however, and, in granting certification, the court distinguished misclassification cases, explaining:

> In [misclassification] cases, the purported class members' job duties, and any dissimilarities among them, will often be relevant to whether the employees are similarly situated for the purposes of the FLSA, insofar as their job duties relate to whether they were correctly classified as exempt from the FLSA's overtime requirements.

*Id.* at 389.  *Scholtisek* thus suggests that misclassification cases are <u>not</u> amenable to certification.

Plaintiff cites *Mendoza* for the proposition that "factual variances in employees' positions, work locations, dates of employment and hours worked will not defeat a finding that employees are similarly situated."  (Pl.'s Mot. 8, citing *Mendoza,* 2008 U.S. Dist. LEXIS 61557, at *6.)  *Mendoza* was not a misclassification case; rather, the plaintiffs there alleged that the company had certain policies, *e.g.*, bi-monthly meetings and extending store hours, that resulted in "off-the-clock" work and unpaid overtime.  *Mendoza*, 2008 U.S. Dist. LEXIS 61557, at *9.  Factual variances of employees' position, such as a detailed analysis of their daily job tasks, were not relevant to the certification analysis.

Finally, Plaintiff argues that *Zhao* holds that even "scant" evidence is sufficient to certify a collective action.  *Zhao* was a tip-pooling case, where the relevant issue was simply whether restaurant food servers were informed of a tip credit.  *Zhao,* 2001 U.S. Dist. LEXIS 10678, at *12-13.  The court found class notice appropriate because it would "be relatively easy to determine whether any servers who opt into the class were informed of the tip credit."  *Id.* at *13.  Such a determination is nothing like the detailed factual analysis that needs to be performed as to each putative class member in a misclassification case.

    2.    **Plaintiff's Anticipated Reliance Upon *Indergit v. Rite Aid Corp.* Is Misplaced.**

Marshalls anticipates that Plaintiff may focus his reply on the recent decision *Indergit v. Rite Aid Corp.*, 2010 U.S. Dist. LEXIS 60202, where Judge Gardephe granted conditional certification to a nationwide class of Rite Aid store managers based largely on his finding that Rite Aid exercised a "great degree of control over" retail branch operations, including the use of "planograms" to dictate how certain items must be displayed. *Id.* at *16-17. Initially, this decision is inconsistent with other cases addressing manager misclassification claims, and is not supported by the decisions on which it relies. For example, *Indergit* cites to the precedent set in *Damassia v. Duane Reade,* 2006 U.S. Dist. LEXIS 73090, and *Francis v. A&E Stores, Inc.,* No. 06 Civ. 1638 (CS)(GAY), 2008 U.S. Dist. LEXIS 83369 (S.D.N.Y. Oct. 15, 2008). In these cases, however, the key fact supporting classification was that the defendant's management representative admitted that the duties of managers were relatively the same at all stores, and the courts expressly relied on this concession to distinguish the case from other similar cases where certification was denied. *See Damassia,* 2006 U.S. Dist. LEXIS 73090, at *17 n.9; *Francis*, 2008 U.S. Dist. LEXIS 83369, at *7-8, *8 n.1; *Chowdhury v. Duane Reade, Inc.*, No. 06 Civ. 2295 (GEL), 2007 U.S. Dist. LEXIS 73853, at *12 (S.D.N.Y. Oct. 2, 2007); *see also Cohen v. Gerson Lehrman Group, Inc.,* 686 F. Supp. 2d 317, 330 (S.D.N.Y. 2010) (certifying approximately 50 research associates where there was evidence that job duties were largely defined by comprehensive corporate policies and procedures and defendant treated all research assistants the same in reclassifying them from exempt to nonexempt). In fact, the *Francis* court suggested that where, as here, the plaintiff "provided nothing beyond conclusory

statements that other employees were similarly situated," certification would <u>not</u> be appropriate. *Francis*, 20008 U.S. Dist. LEXIS 83369, at *8 n.1.[17]

The evidence in this case shows that the duties performed by Marshalls ASMs vary from store to store based on a number of factors. Marshalls operations model is far different from these other retailers. Marshalls Stores do not use "planograms" and are in many ways different from one another. (Parizo Aff. ¶ 23.) At Marshalls, ASMs are expected to act as merchants who use their store-specific knowledge of their customers and employees to manage key departments in multi-million dollar retail stores. (Parizo Aff. ¶ 23.) Unlike other retailers, Marshalls relies upon its Merchandise ASMs to act independently after considering store-specific factors to customize the selection and display of merchandise in such a way as to maximize the sale of goods to meet the customer traffic and purchasing patterns of their stores. (Parizo Aff. ¶ 23.) In addition, the *Indergit* case defined the putative class to include all store managers, who arguably had the same primary duty of store responsibility. In contrast, the Plaintiff's proposed class consists of ASMs, a role that serves different functions within a store and from store-to-store, depending upon factors including retail location and store manager delegation. Accordingly, *Indergit* does not warrant conditional certification here. Rather, *Diaz*, 274 F. Supp. 2d 216, and *Mike*, 2005 U.S. Dist. LEXIS 30382, are both a closer fit and more in line with the weight of authority.

---

[17] *Indergit* also dismisses the holding in *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, based on the mistaken conclusion that the *Holt* court inappropriately considered the merits of the claim in determining whether to grant certification. *Indergit*, 2010 U.S. Dist. LEXIS 60202, at *26 n.8. To the contrary, the *Holt* court expressly stated that it was <u>not</u> weighing the evidence. *Holt*, 333 F. Supp. 2d at 1274. Rather, it was appropriately reviewing all evidence submitted, including the declarations submitted by the defendant, to determine if the plaintiff and the class he sought to represent were similarly situated. *Id.* at 1274, 1274 n.4. That said, this Court has considered the merits of a plaintiff's claims to determine whether notice should issue. *Amendola*, 558 F. Supp. 2d at 467 n.9.

## II.   THE SCOPE AND MANNER OF NOTICE, IF THE COURT DEEMS THIS CASE TO BE "APPROPRIATE" FOR SUCH RELIEF.

### A.   Notice Should Be Limited To The Port Chester, Hartsdale And Bronx Stores.

For the reasons stated above, Marshalls categorically believes that certification is not appropriate.   However, even if the Court is inclined to grant conditional certification, Plaintiff's proposed nationwide class of ASMs is vastly overbroad, as Plaintiff has failed to provide any evidence of an illegal nationwide policy or plan.   The Court should instead limit the collective action to ASMs who worked at the New York stores at which Plaintiff worked – Port Chester, Hartsdale, and the Bronx.[18]   See Fengler v. Crouse Health Found., Inc., 595 F. Supp. 2d 189, 197 (N.D.N.Y. 2009) (court retains discretion to reformulate proposed class).

Plaintiff argues that ASMs are subject to an unlawful exemption policy. However, as discussed above, the policy is facially lawful and, as evidenced by the ASM job summaries, Marshalls expects that ASMs be engaged primarily in exempt tasks.   (See, supra, "Facts" I.C.)   Plaintiff and his supporters offer affidavit testimony that, despite their job descriptions, the bulk of their time was devoted to non-managerial work.   The statements contained in the declarations reflect only the personal experiences of these ASMs in a handful of New York-based stores, however, and should not be imputed to other stores, particularly those in other regions of the country.

To the extent these affidavits purport to show that ASMs in other stores are similarly situated, the generalized and conclusory nature of the allegations undercut their

---

[18]   The four declarants who provide affidavits in support of Plaintiff's motion claim personal knowledge of the employment conditions at one additional store in the New York metropolitan area.   To the extent the Court credits this boilerplate testimony, the class should be limited to those stores where a conceivable "violation" has been alleged, i.e., the stores at which Plaintiff and declarants worked and were allegedly not permitted to perform their managerial role.

credibility.  Three of the affidavits include a crafted statement intended to extrapolate the ASM's experiences to a larger class:

> "[A]s an assistant store manager, I often interacted with other assistant store managers from different districts and regions in New York State.   Each of them described an experience substantially similar to mine." (Pl.'s Mot. Ex. 1, hereinafter "Guillen Aff.", Archibald Aff., and Pl.'s Mot. Ex. 4, hereinafter "Ogaian Aff.".)

The two other affiants make nearly identical statements that based upon their "personal observations" and "discussions with other [Marshalls] employees," they believe that their "duties and responsibilities" are "substantially similar."   (Morales Aff. and Santillan Aff..)   These statements are pure boilerplate, incorporated by Plaintiff to stretch the logical boundaries of the putative class.  Courts typically discount the probative value of such boilerplate language and the Court should do so here.  *See*, *e.g.*, *Yaklin v. W-H Energy Servs., Inc.*, No. C-07-422, 2008 U.S. Dist. LEXIS 36572, at *9 (S.D. Tex. May 2, 2008) ("boilerplate paragraph" that affiant believed employees were similarly situated was insufficient to establish nationwide class); *Smith v. Tradesmen Int'l, Inc.*, 289 F. Supp. 2d 1369, 1372 (S.D. Fla. 2003) (three identical affidavits insufficient to establish nationwide class).

Moreover, the declarants make unsupported contentions that unnamed ASMs at other stores had similar experiences; they do not identify the ASMs, the stores, or even their sources of such knowledge.  Such evidence is hearsay and without foundation and, as such, must be disregarded.  Fed. R. Evid. 602, 802; s*ee Morales v. Plantworks, Inc.*, No. 05 Civ. 2349 (DC), 2006 U.S. Dist. LEXIS 4267, at *7 (S.D.N.Y. Feb. 1, 2006) (conclusory allegations "offered nothing of evidentiary value," and were insufficient to show others were similarly situated); *Laroque v. Domino's Pizza, LLC.*, 557 F. Supp. 2d 346, 355-56 (E.D.N.Y. 2008) (plaintiffs' factual support was reduced to hearsay and generalized statements, making class treatment as to

five Brooklyn stores unwarranted); *Eng-Hatcher*, 2009 U.S. Dist. LEXIS 127262, at *13 n.5 (discounting "general statements" to support claim that other employees are similarly situated to the plaintiff).

The unreliability of the declarations is particularly evident given Guillen's frank concession at deposition that, although his declaration states that "all assistant store managers for all Marshalls locations were required to perform substantially the same duties and responsibilities" (*see* Guillen Aff. ¶ 5), he has no personal knowledge of how the Marshalls stores were run outside of the Bronx, the Hartsdale store where he trained, and a store in Port Chester, New York.[19]    (Guillen Dep. 335:24-340:23, 343:10-16 (Guillen admits he has no evidence that any ASM outside of the Bronx, Hartsdale, or Port Chester are similarly situated to him).)

To the extent the declarations Plaintiff submits are considered, they fail to show that ASMs working in other store locations are similarly situated and, at most, support certification of ASMs at particular New York stores.  In fact, two declarants expressly concede that they lack actual knowledge as to the duties and responsibilities of other ASMs, asserting only an unsupported "belief" that their duties and responsibilities were similar to others. (Archibald Aff. and Santillan Aff.)  *See Monger v. Cactus Salon & Spa's LLC*, No. 08-CV-1817, 2009 U.S. Dist. LEXIS 60066, at *5-6 (E.D.N.Y. July 6, 2009) (plaintiffs' statements that they "believed" others were subject to the same policies were insufficient to expand class beyond the store at which plaintiffs worked); *Bernard v. Household Int'l, Inc.*, 231 F. Supp. 2d 433, 436 (E.D. Va. 2002) (rejecting statements relating to practices outside of Chesapeake and Virginia Beach offices where "prefaced with phrases such as, 'It is my understanding' and 'I believe

---

[19]    Plaintiff spent just one week in the Port Chester store to cover another manager's vacation. (Guillen Dep. 335:17-18.)

that'").   Other declarants expressly limit the scope of their knowledge to ASMs working in particular New York stores.  (*See* Guillen Aff., Archibald Aff., and Ogaian Aff.)

In sum, Plaintiff has not presented admissible evidence demonstrating a factual nexus between his situation and those of ASMs nationwide.  In such circumstances, this Court, where it has granted conditional certification, has done so in a restrictive manner, limiting certification to a few stores.  For example, in *Anglada v. Linens N' Things*, No. 06 Civ. 12901 (CM) (LMS), 2007 U.S. Dist. LEXIS 39105 (S.D.N.Y. Apr. 26, 2007), the plaintiff sought to conditionally certify a nationwide class of assistant managers of defendant Linens 'N Things, which operated in 47 states.  In addition to his complaint, the plaintiff submitted a declaration alleging personal knowledge as to his circumstances as well as the circumstances of four other managerial employees in two New York stores.  *Id.* at *14-15.   He also submitted job descriptions and job postings for various stores across the country.  In granting certification, the court limited the collective action to the two New York stores, explaining that "there exists a total dearth of factual support" for a nationwide class, as the plaintiff lacked personal knowledge of the policies and practices at other stores.  *Id.* at *15-16; *see Camper v. Home Quality Mgmt., Inc.*, 200 F.R.D. 516, 520-21 (D. Md. 2000) (narrowing class from employees at 47 facilities to one facility; while there was a company-wide policy of using time clocks, factual showing of uncompensated work was limited to one facility).

A court may also limit class size where it has concerns about manageability or judicial efficiency.  Plaintiff's theory of liability is premised on his contention that he deviated from Marshalls' written expectation that ASMs perform exempt tasks.  As a result, a collective action would necessarily result in individualized inquiries into each ASM's daily work activities as compared to Marshalls' written expectations.  This would not promote judicial efficiency and,

in fact, would undermine the very purpose of a collective action. *Hoffman-LaRoche*, 493 U.S. at 170 (requirement that proposed class members be "similarly situated" ensures the "efficient resolution of common issues of law and fact").

Moreover, the sheer magnitude of the proposed putative class here would render any collective action unmanageable, as Marshalls is among the world's largest retailers, with thousands of ASMs working in stores across the nation. Courts have denied certification of such vast classes. For example, in *Ray v. Motel 6 Operating, Ltd. P'ship*, No. 3-95-828, 1996 U.S. Dist. LEXIS 22565, at *12 (D. Minn. Feb. 15, 1996), a misclassification case, the court denied conditional certification of a class of between 1000 and 1500 motel managers. The court explained that, while the managers had the same job title pursuant to a similar management plan, they worked at different properties, in different regions in at least twenty different states, and each property varied in terms of number of rooms and budgets. *Id.* at *9-10. The court cited to "significant manageability problems inherent in a trial of 1000 plus individuals." *Id.* at *11. Accordingly, if certification is deemed warranted (which Marshalls believes it is not), restricting the scope of this action to the Port Chester, Hartsdale and Bronx stores would best promote judicial efficiency and case manageability.

**B.    Plaintiff's Proposed Methodology For Facilitating Notice And Request For Confidential Information About Potential Class Members Are Improper.**

**1.    Notice To Potential Class Members Should Be Handled By A Third-Party Administrator.**

If the Court determines that Notice should be sent to potential class members, and Marshalls' contends it should not, Marshalls requests that a neutral third-party administrator be used to issue the Notice. The United States Supreme Court held in *Hoffmann-LaRoche Inc. v. Sperling* that the district courts have a substantial interest in managing communications that are mailed to potential plaintiffs because of "the potential misuse of the class device, as by

misleading communications . . . ." 493 U.S. at 170-71.  Thus, "the court has a managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way."  *Id.*  Courts have recognized the value of using third-party administrators to provide notice to potential class members, and doing so in this case will protect the privacy of the potential class members and prevent improper and intrusive written communications and phone calls from Plaintiff's counsel to current and former Marshalls employees.  *See, e.g., J.S., et al. v. Attica Central Schools*, No. 00-CV-513S, 2006 U.S. Dist. LEXIS 12827, at *21-22 (W.D.N.Y. Mar. 7, 2006) (ordering use of impartial third party to mail notice to potential class members); *Lewis, et al. v. Wells Fargo & Co.*, 669 F. Supp. 2d 1124, 1129-30 (N.D. Cal. 2009) (same); *Robinson, et al. v. Empire Equity Group, Inc.*, No. WDQ-09-1603, 2009 U.S. Dist. LEXIS 107607, at *19-20 (D. Md. Nov. 18, 2009) (ordering the parties to draft a notification plan that "includes safeguards for the privacy of potential class members, such as a requirement that notices be mailed by a neutral third-party administrator").  The use of a neutral third-party administrator is also the best and most efficient way to ensure that any potential order regarding notice is followed and conducted in a neutral fashion.

Plaintiff will not be prejudiced by the use of a neutral third-party administrator. The Notice would provide Plaintiff's counsel's contact information, allowing the potential class members to contact Plaintiff's counsel if they desire.  Marshalls will work with Plaintiff to find a mutually agreeable third-party administrator, and Marshall agrees to pay the costs associated with using a third-party administrator.

### 2.    Plaintiff's Request For Information Other Than Potential Class Members' Last Known Addresses Is Overbroad And Unnecessary.

Plaintiff requests that Marshalls produce "last known mailing address, alternate addresses (if any), all known telephone numbers, email addresses, social security numbers, and

dates of employment" of potential class members.  It is well-established that first-class mailing is the preferred method and that alternative forms of notification should not be used unless the plaintiff presents facts showing that such methods are necessary.  *See Shajan, et al. v. Barolo, Ltd., et al.*, No. 10 Civ. 1385 (CM), 2010 U.S. Dist. LEXIS 54581, at *5 (S.D.N.Y. June 2, 2010); *Gordon, et al. v. Kaleida Health, et al.*, 08-CV-378S, 2009 U.S. Dist. LEXIS 95729, at *35-36 (W.D.N.Y. Oct. 14, 2009); *Hintergerger, et al. v. Catholic Health Sys., et al.*, 08-CV-380S, 2009 U.S. Dist. LEXIS 97944, at *40-41 (W.D.N.Y. Oct. 21, 2009); *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 91 (E.D.N.Y. 2007).  Therefore, other than mailing addresses, the private and personal information requested by Plaintiff is unnecessary and should not be disclosed.  *See Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317, 324 (S.D.N.Y. 2007) (defendant should not provide private information such as social security numbers, telephone numbers, work location and dates of employment for notification purposes); *Hintergerger*, 2009 LEXIS 97944, at *36 ("The Court agrees that, in the interest of privacy, CHS need not produce phone numbers, social security numbers, dates of birth, and e-mail addresses."); *Gordon,* 2009 LEXIS 95729, at *31 (same).

### 3. The Proposed Posting Of Notice In Marshalls Stores Is Unnecessary And Overreaching.

Plaintiff asks that this Court enter an Order compelling Marshalls to post the Notice "in a conspicuous location in all Marshalls stores."  Plaintiff's request should be rejected as courts have held that such posting, under the facts of this case, is unreasonable and unnecessary.  Moreover, an order compelling such posting would violate Marshalls' First Amendment right against compulsion to engage in speech with which it disagrees.

As stated above, first-class mailing of the Notice is the preferred method and alternative forms of notification (such as posting of the Notice) should not be used unless

plaintiff presents facts showing that other methods are necessary.  *See Shajan,* 2010 LEXIS 54581, at *5; *Gordon*, 2009 LEXIS 95729, at *35-36; *Hintergerger*, 2009 LEXIS 97944, at *40-41; *Karvaly*, 245 F.R.D. at 91.  The courts have noted that the only group likely to be reached by posting in an employer's place of business are current employees, and it is clear that an employer will be able to provide accurate mailing addresses for current employees, making such posting at the place of business unnecessary.  *See Shajan*, 2010 LEXIS 54581, at *5 ("Since all current employees will be receiving the notice [via first class mailing], there is no need to require defendants to post the notice in the workplace."); *Gordon*, 2009 LEXIS 95729, at *36-37 ("Moreover, the only group that will be reached by posting are current employees, who have an interest in providing their employer with an up-to-date mailing address. . . . For the reasons stated, I find that first class mail is the 'best notice practicable' and should be sufficient to provide potential class members here the notice to which they are entitled."); *Hintergerger*, 2009 LEXIS 97944, at *40-42 (same).  Posting of the Notice is unnecessary and Plaintiff's request should be denied.

Plaintiff's request that Marshalls post the proposed Notice in its stores must also be rejected because such an order would violate Marshalls' First Amendment rights.  The United States Constitution safeguards not only the right to speak, but also protects against compulsion to disseminate a message with which one disagrees.  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (First Amendment guarantee "includes both the right to speak freely and the right to refrain from speaking at all.").  In *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n*, 475 U.S. 1, 15 (1986), the Supreme Court held that requiring a litigant to include its adversary's views in its billing, "impermissibly requires [the litigant] to associate with speech with which [the litigant] may disagree."  The proposed posting of the Notice in stores unnecessarily seeks to require Marshalls

to disseminate a message to persons outside the putative class and with which it disagrees. Even if Marshalls' right not to disseminate speech with which it disagrees is not absolute, Supreme Court precedent requires that any order burdening the exercise of free speech must be narrowly tailored to serve a compelling state interest. *Id.* at 19. The posting of the Notice requested by Plaintiff is certainly not narrowly tailored because it would be broadcast to many more individuals than is necessary (i.e., non-class members or the general public that visits Marshalls stores).

## CONCLUSION

In sum, certification is not warranted in this matter as Plaintiff has utterly failed to identify any uniform unlawful policy to tie together a nationwide class of ASMs. Certification should also be denied because Plaintiff's own argument – which hinges on his individual experience – would result in thousands of individualized inquiries. Plaintiff has adduced no competent evidence supporting a national class of over 6,000 ASMs but has submitted only limited evidence from a sampling of New York stores. Accordingly, while Marshalls submits that certification is not warranted, if any certification is granted it should <u>at most</u> be limited to those stores.

Finally, the facilitation of Section 216(b) collective actions must be balanced against the long-standing and well-founded judicial concern about the unwarranted "stirring up" of litigation. *See Horne*, 279 F. Supp. 2d at 1237; *Hoffman-LaRoche*, 493 U.S. at 181 (Scalia, J., dissenting) ("'Stirring up litigation' was once exclusively the occupation of disreputable lawyers, roundly condemned by this and all American courts"). Plaintiff's effort to justify nationwide notice to current and former ASMs, despite the individual circumstances presented by his claims based upon such limited testimony, falls far short of any relevant standard that the Court may deem appropriate in consideration of the existing record.

Date:   July 9, 2010
        New York, New York

                                        /s/ Gary D. Shapiro
                                        Gary D. Shapiro (4554218)
                                        gshapiro@littler.com
                                        LITTLER MENDELSON, P.C.
                                        900 Third Avenue
                                        New York, NY  10022
                                        212.583.9600

                                        Andrew J. Voss
                                        *admitted pro hac vice*
                                        avoss@littler.com
                                        LITTLER MENDELSON, P.C.
                                        1300 IDS Center
                                        80 South 8th Street
                                        Minneapolis, MN  55402.2136
                                        612.630.1000

                                        Lisa A. Schreter (629852)
                                        *admitted pro hac vice*
                                        lschreter@littler.com
                                        LITTLER MENDELSON, P.C.
                                        3348 Peachtree Road, N.E., Suite 1500
                                        Atlanta,  GA 30326-4803
                                        404.233.0330

                                        Attorneys for Defendants
                                        MARSHALLS OF MA, INC., MARMAXX
                                        OPERATING CORPORATION, and THE
                                        TJX COMPANIES INC.

96208119.1 053070.1038